UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-61366-CIV-ALTONAGA/DUBÉ

MARIA NADAL,

       Plaintiff,

v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

       Defendant.

_____/

## REPORT AND RECOMMENDATION

THIS CAUSE is before this Court on the Motion for Summary Judgment filed by the Plaintiff

(D.E. #14) and the Motion for Summary Judgment filed by the Defendant (D.E. #20) pursuant to a

Clerk's Notice of Magistrate Judge Assignment entered by the Clerk of Court, United States District

Court for the Southern District of Florida. The issue before this Court is whether the record contains

substantial evidence to support the denial of benefits to Plaintiff, Maria Nadal (hereinafter "Nadal"

or "Plaintiff").

## I. FACTS

On September 21, 2004, the Plaintiff filed an application for disability insurance benefits

alleging a disability onset date of September 1, 2003. (R. 21).[1] The application was denied initially

and on reconsideration. (R. 55-59, 65-68). An initial hearing was held on January 8, 2007. (R. 656-

676). Following the hearing, the ALJ issued a partially favorable decision finding the Plaintiff

---

1. All references are to the record of the administrative proceeding filed as part of the Defendant's answer.
The actual application is not part of the record, however, the ALJ refers to it in his decision. (R. 21).

disabled for a closed period from September 1, 2003 through June 30, 2005. (R. 17-32). A request for review filed with the Appeals Council was denied. (R. 8-11).

The Plaintiff, age 45 at the time of the hearing on January 8, 2007, testified she is right handed, graduated high school and last worked in May 2003. (R. 660). Nadal stated her last job was as an office manager at a sign company, and she stopped working because the company relocated to New York. (R. 660-661). According to the Plaintiff, she looked for employment after the company's relocation, but was not hired anywhere. (R. 661).

Nadal was diagnosed with non-small cell lung cancer in both lungs; had her upper lobes surgically removed and underwent chemotherapy before and after her surgeries. She was first diagnosed with cancer in her left lung in August 2003. (R. 661-662, 665, 670). The Plaintiff testified that her first surgery was in December 2003 (left lung), and her second surgery was in September 2004 (right lung). (R. 661-662). Following her second surgery, wherein doctors removed the upper part of her right lung, she contracted ARDS (a form of pneumonia) and was in a coma for about 14 days. (R. 662-663). The Plaintiff further explained that she was in ICU approximately 18 days, a couple of more days in a regular room, sent for rehabilitation at home for 3-4 weeks, then transferred to Memorial West Rehabilitation Center for about 6 months. (R. 663-664). Nadal stated she was at Memorial West from December 2004 to June 2005. (R. 664).

The Plaintiff testified she has a full body scan every 3-4 months to determine if the cancer is recurrent; and MRI's to make sure the cancer has not spread to her brain. (R. 664-665, 674). According to the Plaintiff, she cannot walk very much because she gets tired; has problems breathing; sleeps with a sleep apnea machine; has tingling sensations in her fingers and feet; and is exhausted all the time. (R. 664).

2

Nadal stated she is being treated by Dr. Strauss[2] (chiropractor) every month; Dr. Arturo Logrono[3] (general medicine) every couple of months; and Dr. Magcalas[4] (pulmonologist), Dr. Cabrera[5] (psychologist), and Dr. Alves[6] (oncologist) every 3 months. (R. 666-667, 669-670). The Plaintiff testified she starting going to the chiropractor on the recommendation of her cousin. (R. 666). Additionally, the Plaintiff testified that Dr. Sultan Ahmed performed a physical evaluation on August 18, 2006 wherein he indicated she could occasionally and frequently lift less than 10 pounds. (R. 667). Dr. Ahmed did perform strength tests to make this determination and ultimately determined Nadal retained the ability to perform less than sedentary work. (R. 668). Dr. Ahmed also noted that Nadal's lung age is that of an 80 year old. (R. 670).

When asked by the ALJ if Nadal thinks she will ever be able to return to work, Nadal responded as follows:

> Probably not.
>
> …
>
> I'm just tired all the time. My lungs is like, they're not working properly. Anything that I do I get terribly exhausted. My days are spent in front of the TV. I don't do anything else.

(R. 668).

Additionally, Nadal does not think she is capable of working an 8-hour a day job because she

---

2. Incorrectly spelled throughout the transcript as Dr. Straughs.

3. Incorrectly spelled throughout the transcript as Dr. Loverno or Dr. Mogrono.

4. Incorrectly spelled throughout the transcript as Dr. Margolis.

5. Incorrectly referred to as Dr. Carrera throughout the transcript.

6. Incorrectly spelled throughout the transcript as Dr. Alaves.

is "tired all the time." (R. 669). According to the Plaintiff, her husband does the housework, and she "sometimes" goes grocery shopping with him. (R. 668-669, 674).

Next, counsel for the Plaintiff asked if Nadal had any side effects from the chemotherapy. To which she stated the side effects as follows: loss of hair (eyelashes, eyebrow); nail and skin changes; memory loss; and constipation. (R. 671). According to the Plaintiff, her chemotherapy consisted of taxotere and cisplatin, and was administered via IVs, which lasted 7 hours, once every 3 weeks. (R. 671-672). The Plaintiff reiterated that she started chemotherapy in September 2003 and stopped in November 2003, then underwent surgery in December and started chemotherapy again in February 2004 and was given 5 IVs. (R. 673-674).

In addition to the testimony presented at the hearing, medical records were submitted to the ALJ. However, a review of the medical records and the specific issues raised by the Plaintiff in her Motion for Summary Judgment shows the resolution of the issues do not require this Court to specifically set out all the medical evidence in detail. Accordingly, this Court will set out the pertinent medical records only, then proceed to discuss the legal issues involved and will incorporate the facts as appropriate within the arguments presented below.

The Plaintiff was seen by Yale M. Cohen, M.D., treating cardiologist, three times in August and December 2005, and medical notes reveal that Nadal was not experiencing any change in weight, fever, memory loss or recurrent headaches; was experiencing shortness of breath, chest pain, dizziness and depression; was in no apparent distress; and her lungs were clear to auscultation without rales, rhonchi or wheezing. Dr. Cohen's assessment, which was almost identical in all three visits, stated pulmonary hypertension, benign CT angio; hypertension, controlled; chest pain syndrome; and sleep apnea symptoms. (R. 479-475).

4

On October 9, 2006, the Plaintiff was treated by Dr. Cohen with complaints of chest pain and shortness of breath after walking up one flight of stairs. (R. 470). Dr. Cohen noted that Nadal's respiratory pattern was nonlabored, there were no rales detected by auscultation, no rhonchi and no wheezes. (R. 471). Additionally, there was no musculoskeletal deformities noted and the Plaintiff was oriented to time, person and place, and her mood was appropriate. Dr. Cohen's impression was pure hypercholesterolem, improved hypertension, chest pain-benign work up, and pulmonary hypertension-benign CT angio. (R. 472).

Medical notes from Dr. Mario M. Magcalas, pulmonologist, dated August 16, 2005, reveal that the Plaintiff was seen for intermittent dizziness and shortness of breath when climbing flights of stairs. Dr. Magcalas noted a history of lung cancer without any evidence of recurrence; pulmonary HTN, clinically stable and mild; a history of reactive airways disease and COPD; possible diabetes; and acid peptic disease. (R. 627). On September 15, 2005, Dr. Magcalas again noted Nadal's complaints of dizziness, however, her carotid ultrasound and echocardiogram were normal with only mild pulmonary HTN. Nadal's physical examination was unremarkable; no carotid bruits; clear lungs; normal CVS (RRR, S1 and S2); and no clubbing, cyanosis or edema. Dr. Magcalas noted mild pulmonary HTN and clinically stable COPD, asthma. (R. 624).

On January 17, 2006, Dr. Magcalas' medical notes reveal that the Plaintiff continued to experience dizziness, weight gain and a good appetite. Dr. Magcalas further noted that the Plaintiff was afebrile, in no distress; her vital signs were stable and lungs were clear. (R. 618). According to Dr. Magcalas, pulmonary function test revealed mild obstruction of the large and small airways without significant bronchodilator response; and CT scans of the chest and abdomen showed a single small focal hypodensity in the mid lobe of the liver which is too small to characterize with no evidence

of lung nodules or masses. (R. 618-623). Dr. Magcalas opined that there was no evidence of lung cancer recurrence; clinically stable COPD; and dizziness, etiology unknown. (R. 618).

Medical notes from follow-up visits with Dr. Magcalas dated May 16, 2006 and October 5, 2006, reveal that the Plaintiff complained of fatigue, but denied any other complaints. (R. 612, 615). Dr. Magcalas diagnosed Nadal with COPD - stable; lung cancer with no evidence of recurrence; and pulmonary HTN - resolved. (R. 614, 617).

A Medical Assessment of Ability to do Work-Related Activities (Physical) prepared by Dr. Magcalas on December 18, 2006, found that the Plaintiff could frequently lift/carry no more than 10 pounds for less than 2 hours of an 8-hour day; was able to stand/walk for less than 2 hours of an 8-hour day; and was able to sit without difficulties. (R. 607-611). Additionally, Nadal was able to occasionally balance, stoop, crouch, kneel, and crawl, but never climb. The Assessment also found that the Plaintiff was unable to push/pull, but had no limitations in reaching, handling, feeling, seeing, hearing or speaking. (R. 608). Dr. Magcalas found that all environmental restrictions were affected by the Plaintiff's impairments. (R. 609).

According to Dr. Magcalas, the Plaintiff's weakness or fatigue is moderately-severe, and the Plaintiff is unable to perform light or sedentary work on a sustained basis. (R. 610). Additionally, Dr. Magcalas noted that the Plaintiff's impairments have been present since May 2003 to present; and he opined that Nadal's impairments can be reasonably expected to last "indefinitely." (R. 611).

The report of a consultative examination on August 17, 2005 by Samuel Rand, M.D., recounted the Plaintiff's bilateral lobectomies on the left and right lungs, tubal ligation and lymph node dissection surgeries and noted present complaints of shortness of breath when walking about 25 feet, dizziness, loss of hearing, pulmonary hypertension, bad memory and chest pain. (R. 331-340).

6

Dr. Rand noted that the Plaintiff's reported chest pain was "on and off, but her workup was negative." According to the report, the Plaintiff denied any cephalgia, weight loss or change in bowel habits; her chest was clear to auscultation and percussion with no wheezing, rales or rhonchi; and her heart had normal sinus rhythm, and no murmurs or thrills. (R. 332).

Neurological examination showed cranial nerves were intact; coordination. manual dexterity and gait were normal; motor was normal to bulk tone and strength; affect was semi-depressed; and she was able to ambulate without the use of any assistive device. (R. 333). The report further revealed normal range of motion in all joints. (R. 334-336). The report lists an impression of cancer of the lung bilaterally, status post-bilateral lobectomies; pulmonary hypertension by history and depression by history. (R. 333).

A Spirmoetric Pulmonary Function Report performed on August 17, 2005, noted that the Plaintiff did not suffer from acute respiratory illness and reported FEV1 (liters) testing results as follows: pre-bronchodilatation #1) 1.425, #2) .725 and #3) .875; and post-bronchodilatation #1) 1.525, #2) 1.475 and #3) 1.300. (R. 337-340). Additionally, the report noted that the Plaintiff tested positive for COPD. (R. 337).

Additionally, a high resolution chest CT scan performed on August 22, 2005, found no focal pulmonary parenchymal abnormalities and no evidence of diffuse interstitial lung disease. (R. 461-462).

Medical records from Arturo R. Logrono, M.D., treating physician, dated August 24, 2005, reveal that the Plaintiff suffered from pulmonary hypertension and dizziness. (R. 553). Subsequent visit notes dated January 27, 2006, reveal that Nadal was "doing better" although she was diagnosed with alopecia secondary to chemotherapy and pulmonary HTN. (R. 552). On April 4, 2006, Dr.

Logrono noted that the Plaintiff was seen for bloating, acid reflux and abdominal pain; and on April 19, 2006, she reported having "less abdominal pain." (R. 550-551). On October 24, 2006, the Plaintiff returned to Dr. Logrono for a follow-up visit and reported "doing better, but felt tired" and she had no difficulties with concentration. (R. 549).

A Medical Assessment of Ability to do Work-Related Activities (Physical) prepared by Dr. Logrono on November 18, 2006, found that the Plaintiff could frequently lift/carry no more than 10 pounds for less than 1/3 of an 8-hour day; was able to stand/walk for less than 1/3 of an 8-hour day, including less than 1/3 of an 8-hour day without interruption; and was able to sit without difficulties. (R. 544-548). Additionally, Nadal was able to occasionally balance, stoop, crouch, kneel, and crawl, but never climb. The Assessment also found that the Plaintiff was unable to push/pull or hear due to her lung capacity and hearing impairment. (R. 545). Dr. Logrono checked-off all environmental restrictions except vibration. Dr. Logrono also noted that the physical functions that affected her environmental restrictions were lung cancer, COPD, depression, hearing impairment, and memory loss. (R. 546).

According to Dr. Logrono, the Plaintiff's weakness or fatigue is moderately-severe, and the Plaintiff is unable to perform light or sedentary work on a sustained basis due primarily to decreased lung function. (R. 547). Additionally, Dr. Logrono noted that the Plaintiff's impairments have been present for over 3 years; and he opined that Nadal's impairments can be reasonably expected to last "probably [a] lifetime." (R. 548).

The report of a psychological evaluation conducted by Carmen Cornide, Psy.D., on August 31, 2005 states that Nadal reported poor short-term memory and hearing since her second surgery; her circulation has been affected; has no energy or motivation; feels hopeless and helpless; and has

8

anxiety attacks for fear of not being able to breathe. (R. 341-343).  Additionally, she reported increase in weight since the chemotherapy; poor sleep pattern; able to engage in self-care activities at the present time, but not before; limited to lifting and carrying due to frequent dizziness; and able to pay her bills.  However, Dr. Cornide noted that Nadal is unable to manage her benefits at the present time. (R. 342).

The Plaintiff was described as very tearful throughout the evaluation; mood was sad; affect was flat; eye contact was appropriate; alert and attentive throughout the evaluation; and was oriented x 3. (R. 342-343).  Nadal reported hallucinations since her first surgery; denied delusional thoughts; her judgment was noted as good; and her insight appropriate. (R. 343).

The report listed a diagnostic impression of major depression, single and severe and a GAF of 44. (R. 341).  The report concludes with the following recommendations/prognosis:

> The claimant is in need of continued medical attention.  She should continue with her medications.  She is also in need of outpatient therapy, as she is having much difficulty dealing with her medical problems and related sense of helplessness and hopelessness. Prognosis at present time is fair.

(R. 343).

On September 7, 2005, an ultrasound was taken due to indication of dizziness/vertigo.  The ultrasound found no evidence of hemodynamically significant atherosclerotic plaque. (R. 454-455).

A Physical Residual Functional Capacity Assessment dated September 15, 2005, found that the Plaintiff could lift/carry twenty pounds occasionally and ten pounds frequently; stand/walk or sit for six hours of an eight hour day and had unlimited ability to push/pull. (R. 344-351).  The postural limitations of climbing ramp/stairs/ladder/rope/scaffolds were marked as "occasionally," with balancing, stopping, kneeling, crouching and crawling deemed "frequently." (R. 346).  There were

9

no communicative limitations, and the only environmental limitation found was to avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc. (R. 348).

A Psychiatric Review Technique dated September 16, 2005, found the presence of an affective disorder of depressive syndrome which is characterized by anhedonia or pervasive loss of interest in almost all activities; appetite disturbance with change in weight; decreased energy; or feelings of guilt or worthlessness. (R. 352, 355). The Plaintiff was seen as having mild restrictions of activities of daily living; difficulties in maintaining social functioning; difficulties in maintaining concentration, persistence or pace and no episodes of decompensation. (R. 362). The PRT's consultant's notes conclude by stating that although the Plaintiff appears to have some difficulty dealing with her medical problems, she does not appear to have a severe mental impairment. (R. 364).

Records from Dr. Ney Alves, treating oncologist, dated September 19, 2005 through October 23, 2006, reveal normal physical examinations (R. 498-501, 504-505), no evidence of cancer (R. 502), and no complaints by the Plaintiff. (R. 504-505). On March 6, 2006, Carl Drucker, M.D. noted that the Plaintiff's hearing was stable and Nadal reported feeling better from her sleep apnea since using the CPAP machine. (R. 539-540). Dr. Drucker diagnosed Nadal with a benign Thornwaldt's cyst in her brain, and his treatment plan was to follow-up with the Plaintiff in 3 months for observation. (R. 538).

The Plaintiff underwent a sleep study on December 15, 2005, which found Nadal to have a mild overall, severe REM/supine related Obstructive Sleep Apnea Syndrome (OSAS) associated with mild oxygen desaturations. A C-PAP machine was recommended at night time. (R. 441).

On December 27, 2005, a Neuropsychological Evaluation was performed by Rhonda Q. Freeman, Ph.D. wherein the Plaintiff reported experiencing difficulty with cognition for two months

and described her mood as "up and down" in response to her medical difficulties. (R. 369-372). The Plaintiff also reported that she remains independent in her activities of daily living and recounted her medical history as follows: lung cancer (in remission); migraines (in past); changes in hearing and eyesight since September 2004; poor sleep; and increased appetite. Nadal's concentration, problem solving, comprehension, and spatial skills were described as normal. (R. 369).

According to the Plaintiff, she was prescribed antidepressants, but is currently not under the care of a mental health professional. Dr. Freeman noted that Nadal arrived on time and unaccompanied to her appointment, and although mildly distressed, she was able to provide details related to her recent and past history. Additionally, Nadal's thoughts were clear and goal directed; had no difficulties related to motivation, basic attention, initiation and task in the testing environment; and appeared focused, able to comprehend the examiner, and put forth effort throughout the evaluation. The Plaintiff's intellectual functioning was within the low average range. (R. 370).

In summary, Dr. Freeman noted the Plaintiff's memory performances were within the average range with the exception of tests that required considerable attention to detail. Nadal's areas of weakness were basic attention/concentration, verbal fluency, processing speed, and visuoconstructional skills; and impairments were noted in tasks associated with higher order functions/executive functions and naming. Dr. Freeman listed a diagnostic impression of cognitive disorder NOS, adjustment disorder with depressed mood and a GAF of 77. Dr. Freeman's recommendations were for Nadal to follow-up with her neurologist and resume treatment with her psychologist or a new psychologist. The Plaintiff declined the recommendation to resume psychological treatment. (R. 372).

Office visit notes dated January 18, 2006 through December 4, 2006 from Gerald J. Strauss,

11

D.C., chiropractor, reveal that the Plaintiff's complaints included joint and neck pain; hair loss; pain in both breasts, hands and wrists; hearing loss; vertigo; shortness of breath; memory loss; dizziness; pain walking; weakness; fatigue; headaches; tiredness; and sore throat. (R. 581-583, 589-606). Dr. Strauss's comments included vertigo; low blood pressure; pulmonary HTN; numbness in legs; COPD; and carpal tunnel in both hands (R. 596-599).

On November 2, 2006, a Medical Assessment of Ability to do Work-Related Activities (Physical) was prepared by Dr. Strauss, which found that the Plaintiff could frequently lift/carry 1 pound; was able to stand/walk for 1 block; and was able to sit for 2 hours and for 1 hour without interruption in an 8-hour workday. (R. 584-588). Additionally, Nadal was able to occasionally balance, but never climb, stoop, crouch, kneel or crawl. The Assessment also found that the Plaintiff was unable to reach, handle, push/pull or hear; and was environmentally restricted in all areas due to vertigo, breathing, COPD, and memory loss. (R. 585-586). According to Dr. Strauss, the Plaintiff's weakness or fatigue is severe, and the Plaintiff is unable to perform light or sedentary work on a sustained basis. (R. 587). Additionally, Dr. Strauss noted that the Plaintiff's impairments have been present since May 2003; and he opined that Nadal's impairments can be reasonably expected to last "indefinitely." (R. 588).

During a follow-up visit with Richard P. Singer, M.D., neurologist on January 20, 2006, Nadal was confirmed to have sleep apnea. (R. 495-496). However, Dr. Singer opined that he believed "once she starts using the CPAP machine she should be feeling even much better." The Plaintiff's physical examination was within normal limits, including chest, heart and motor strength. (R. 495). Dr. Singer's impression was mild cognitive impairment and he believes Nadal does not need any medication. (R. 496).

12

A CT scan of the chest, abdomen and pelvis was taken on April 6, 2006, which found no evidence of new pulmonary nodules; a small hypoattenuating lesion in the right lobe of the liver, which is too small to recharacterize with CT; and no evidence of abdominal masses or fluid collections. (R. 447-488). On May 3, 2006, Nadal underwent a Doppler Echocardiogram which gave an impression of normal LV and valvular function, and pulmonary arterial pressure. (R. 445).

Records from Howard I. Baikovitz, M.D., gastroenterologist, dated August 10, 2006 and October 31, 2006, reveal that the Plaintiff suffered from acid reflux symptoms; physical examinations were unremarkable in both visits; she was prescribed over-the-counter antacids; and recommended to keep an antireflux diet. (R. 541-543).

On August 18, 2006, the Plaintiff underwent a consultative examination with Sultan S. Ahmed, M.D. (R. 374-394). The Plaintiff recounted her medical history and complained of pain in her chest wall, dizziness, difficulty hearing, depression and memory loss. Nadal's daily medications were noted as Zyrtec (allergies), Effexor 3.75 mg (depression), and Spiriva, Albuterol, and Rhinocort (COPD). (R. 374). Upon physical examination, Dr. Ahmed found the Plaintiff alert, awake and oriented x 3; hearing was normal in both ears; shape, size and expansion of chest was normal; mild tenderness over the chest wall; no respiratory distress; normal motor strength in all extremities; and normal gait. Additionally, the Plaintiff was able to supine and seated straight leg raising test normally. (R. 375-376).

According to Dr. Ahmed, the Plaintiff's mental status was as follows: depressed mood; intact alertness, attention, concentration, reliability, judgment, insight and associations; anxiety; recent memory was impaired; and remote memory was not impaired. The Plaintiff was diagnosed with lung cancer, COPD, chronic chest wall pain, depression, anxiety, hair loss, memory loss, S/P lobectomy

of lungs and history of hearing loss. Dr. Ahmed concluded that Nadal was anxious and depressed due to her lung cancer and recommended further evaluation by a psychiatrist. (R. 379).

A Spirmoetric Pulmonary Function Report performed on August 18, 2006, noted that the Plaintiff did not suffer from acute respiratory illness and reported FEV1 (liters) testing results as follows: pre-bronchodilatation #1) 1.31, #2) 1.31 and #3) 1.31; and post-bronchodilatation #1) 1.31, #2) 1.31 and #3) 1.31. (R. 380). Additionally, the report noted that the Plaintiff's estimated lung age was 80 years. (R. 383-394).

Dr. Ahmed completed a Medical Source Statement of Ability to do Work-Related Activities (physical) form on August 18, 2006. (R. 395-398). Dr. Ahmed stated that as a result of the Plaintiff's lung cancer, chronic chest wall pain, history of COPD and limited lung function after lobectomy, the Plaintiff is unable to lift/carry more than 10 pounds occasionally/frequently; and is able to stand and/or walk for at least 2 hours in an 8-hour workday. (R. 395-396). Dr. Ahmed opined that the Plaintiff can never climb; and can occasionally balance, kneel, crouch, crawl or stoop. Dr. Ahmed explained that Nadal's "overall general health is compromised due to lung cancer and radiation therapy. She needs more rest than physical work." (R. 396).

Dr. Ahmed found Nadal's ability to reach, handle, finger, feel, see or speak were not affected by her impairments. However, she was limited in hearing and Dr. Ahmed described her limitation as follows: "The patient has history of hearing impairment, when she is surrounded by more than one person talking." (R. 397). According to Dr. Ahmed, the Plaintiff "has lung cancer and COPD, she has limited pulmonary bronchial function, because of that she should avoid extreme temperature, dust, humidity/wetness; fumes odors, chemical, gases, etc. She is significantly depressed, so it is not good for her to be around heavy machinery and heights." Additionally, Nadal's environmental limitations

14

included noise. (R. 398).

The report of a psychological evaluation conducted by Beatriz Cabrera, Psy.D., on August 22, 2006 states that Nadal reported feeling depressed; having anxiety attacks; difficulties with her short term memory; dizziness; and sleep disturbance. (R. 399-401). The report notes no evidence of a cognitive disorder and found the Plaintiff to have abstract reasoning skills. (R. 400). Additionally, the Minnesota Multiphasic Personality Inventory-Second Edition (MMPI-II) was administered to assess emotional and personality functioning, and Dr. Cabrera notes as follows:

> The validity scales yielded an invalid profile, suggesting what appear to be efforts to present unfavorably or ill. In addition, basic scale scores were elevated beyond the clinically significant range on 8 of the 10 scales. These clinical scales were more extremely elevated than would be expected on a valid profile from a mentally ill individual. The MMPI-II can therefore not be interpreted except for identifying a pattern of invalidity or attempts to fake-bad.

(R. 400-401).

The report listed a diagnosis of adjustment disorder with mixed anxiety and depressed mood and a GAF of 70. (R. 401).

Dr. Cabrera also completed a Medical Assessment of Ability to do Work-Related Activities (Mental). The Plaintiff was seen as having a "slight" restriction in her abilities to understand, remember and carry out simple and detailed job instructions. Additionally, the Plaintiff was found to have no restriction in her ability to make judgments on simple work-related decisions, or respond appropriately to supervision, co-workers, and work pressures in a work setting. (R. 402-403).

After a hearing and review of the record, the ALJ issued an opinion finding that the Plaintiff had the following severe impairments: a history of lung cancer, status post lobectomies (x2), and chronic obstructive pulmonary disease. (R. 24). The ALJ further found that the Plaintiff had non-

severe impairments of an adjustment disorder and a cognitive disorder. (R. 25). The ALJ determined that from September 1, 2003 through June 30, 2005, the Plaintiff had a residual functional capacity to perform less than a full range of sedentary work, and thus, was disabled. (R. 27-28). According to the ALJ, medical improvement occurred as of July 1, 2005 and the Plaintiff retained the RFC to perform a wide range of sedentary work. (R. 28-31). The ALJ found that the Plaintiff could not return to her past relevant work as an office manager. The ALJ concluded that the Plaintiff's disability ended on July 1, 2005. (R. 31).

## II. LEGAL ANALYSIS

Judicial review of the factual findings in disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's findings and whether the correct legal standards were applied. 42 U.S.C. section 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Kelley v. Apfel, 185 F.3d 1211, 1213 (11th Cir. 1999); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). "Substantial evidence" is more than a scintilla, but less than a preponderance and is generally defined as such relevant evidence which a reasonable mind would accept as adequate to support a conclusion. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).

In determining whether substantial evidence exists, the court must scrutinize the record in its entirety, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. Foote v. Chater, 67 F.3d 1553 (11th Cir. 1995); Lamb v. Bowen, 847 F.2d 698, 701 (11th Cir. 1988). The reviewing court must also be satisfied that the decision of the Commissioner correctly applied the appropriate legal standards. See, Bridges v. Bowen, 815 F.2d 622, 624 (11th Cir. 1987). The court may not reweigh evidence or substitute its judgment for that of the ALJ, and even if the evidence preponderates against the Commissioner's decision, the reviewing court must

16

affirm if the decision is supported by substantial evidence. See, Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005).

The restrictive standard of review set out above applies only to findings of fact. No presumption of validity attaches to the conclusions of law found by the Commissioner, including the determination of the proper standard to be applied in reviewing claims. Brown v. Sullivan, 921 F.2d 1233, 1236 (11th Cir. 1991); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). The failure by the Commissioner to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal. Cornelius v. Sullivan, 936 F.2d 1143, 1145-1146 (11th Cir. 1991).

Social Security Regulations establish an eight step evaluation process to determine whether a claimant's medical condition has improved or if a disability continues. See, 20 C.F.R. §404.1594(f).

The first determination is whether the claimant is engaged in substantial gainful activity. If so, a finding of a disability status will end. §404.1594(f)(1). If not, it must be determined whether the claimant suffers from an impairment or combination of impairments which meets or equal the severity of an impairment listed in Appendix 1, Subpart P of Regulations No. 4. If so, the disability will be found to continue. §404.1594(f)(2). If not, the determination to be made is whether there has been medical improvement in the claimant's condition. §404.1594(f)(3). Medical improvement is defined in the regulations as any decrease in the medical severity of any impairment which was present at the time of the most recent favorable decision finding the claimant disabled. §404.1594(b)(1).

If there has been medical improvement, it must then be determined whether the improvement is related to the claimant's ability to do work. §404.1594(f)(4). If not related to ability to do work (or if no medical improvement has been seen) consideration must be given to whether any exceptions

17

to the medical improvement standard exist. If none apply, the disability will be found to continue. §404.1594 (f)(5).

If a finding is made that the medical improvement is related to the ability to do work, the determination to be made is whether the claimant has a severe impairment or combination of impairments. If not, the claimant will no longer be considered disabled. §404.1594(f)(6). However, if the impairment or impairments are severe, the claimant's residual functional capacity will be assessed to consider whether the claimant can do the work performed in the past. If this work can be performed, disability will be found to have ended. §404.1594(f)(7).

If the claimant is not able to do the work performed in the past, a determination must be made, at step eight, whether the claimant can do other work considering the residual functional capacity assessment as well as the claimant's age, education and past work experience. If so, the disability will be found to have ended, if not, the disability will continue. §404.1594(f)(8).

The Plaintiff's first point of contention is that the ALJ's determination that the Plaintiff had medical improvement as of July 1, 2005 is not supported by substantial evidence. Specifically, the Plaintiff argues that the ALJ improperly evaluated the Plaintiff's mental limitations, improperly rejected Dr. Strauss's functional capacities evaluation and improperly rejected the Plaintiff's testimony. The Plaintiff also contends that the ALJ's determination that the Plaintiff's medical improvement was related to her ability to work was not supported by substantial evidence. The Plaintiff's final point of contention is that the ALJ committed reversible error by not documenting how he applied the 8-step medical improvement sequential evaluation process to the Plaintiff's case.

In evaluating the Plaintiff's mental limitations, the ALJ noted as follows:

Accordingly, it is found that the claimant has an adjustment disorder

18

and a cognitive disorder, impairments which do not significantly limit the claimant's abilities to do work-related activities, i.e. they are non-severe.  The claimant is limited, to some extent, by her physical conditions.  She has never pursued any formal mental health treatment or treatment for poor memory.  Dr. Cabrera's assessment is well-supported by the medical record.  Although she may experience some mild depression related to her medical problems, she remains fully functional from a mental perspective.

(R. 25).

The Plaintiff argues that the ALJ's conclusion regarding the Plaintiff's depression not being severe because "[s]he has never pursued any formal mental health treatment or treatment for poor memory" is not true given the fact that most doctors noted that Nadal was depressed and several noted that she was taking Effexor. (D.E. #14, pg 11).  The Defendant states that a diagnosis alone is insufficient for finding an impairment severe.  The Defendant further states that the severity of an impairment must be measured in terms of its effect upon ability to work and "not simply in terms of deviation from purely medical standards of bodily perfection or normality." McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986).

According to the medical record, it appears that the only time the Plaintiff was under the care of a clinical psychologist (Dr. Tania Diaz) was from June 23, 2004 to July 28, 2004. (R. 579-580). Dr. Diaz submitted a Psychological Summary Report which diagnosed the Plaintiff with major depression disorder, recurrent; cancer; problem with primary support; and a GAF of 50 (current) and GAF of 65 (discharge).  Dr. Diaz concluded by stating as follows: "It is important to note that Mrs. Nadal's symptoms are directly related to the fear, apprehension, and stress she endured subsequent to her medical condition.  Mrs. Nadal's last therapy appointment was on July 28, 2004." (R. 580).

This Court notes that the Plaintiff was seen by Dr. Diaz two months before her second surgery

19

and did not return to Dr. Diaz after the surgery. Additionally, as detailed above, the medical records reveal that on August 31, 2005, Dr. Cornide recommended continued medical attention and outpatient therapy to help Nadal deal with her medical condition; on September 16, 2005, Dr. Clark indicated the Plaintiff did not appear to have a severe mental impairment; on December 27, 2005, Dr. Freeman noted that Nadal was not under the care of any mental health professional; and on August 22, 2006, Dr. Cabrera performed an MMPI-II test which was invalid due to the Plaintiff's "efforts to present unfavorably or ill" or "attempts to fake-bad." (R. 343, 364, 372, 400-401).

This Court agrees with the Defendant in that there is no evidence in the record that Nadal's depression imposes any limitations on her ability to perform work, and thus, the ALJ correctly determined her mental impairment to be non-severe. Based on the medical evidence of record, it is this Court's impression that the Plaintiff's depression resulted from her physical problems and has improved as her condition improved. Therefore, no error is found on this basis.

Next, the Plaintiff contends that the ALJ improperly rejected Dr. Strauss's functional capacities evaluation because it contradicted the evidence and since he is not an acceptable medical source. The Defendant argues that the ALJ correctly determined that Dr. Strauss was not an acceptable source according to SSR 06-03p, and that the extreme limitations outlined by Dr. Strauss were inconsistent with the record, including the Plaintiff's treating physicians.

With regard to the opinion of Dr. Strauss, the ALJ stated as follows:

> The claimant saw Gerald Strauss, a chiropractor, from January 2006 to December 2006 for biweekly treatment (Exhibit 29F). Dr. Strauss also completed a medical source statement indicating that the claimant would be unable to: Lift greater than 1 pound; stand or walk for greater than one block; sit longer than two hours; climb, stoop, crouch, kneel and crawl.

(R. 27).

The ALJ rejected the assessment by Dr. Strauss, and specifically stated as follows:

> I reject Dr. Strauss' assessment as to the claimant having retained a
> less than sedentary exertional capability, since it is contradictory to the
> evidence as a whole and since he is not an acceptable medical source.
> Otherwise, I accord considerable weight to the opinions of the
> claimant's treating and consultative physicians since they have had the
> opportunity to examine the claimant and their opinions are consistent
> with the overwhelming evidence of record. In reaching the above
> conclusions, I have carefully considered the guidelines in <u>Social
> Security Ruling</u> SSR 96-6p.

(R. 31).

While it is true that a chiropractor is not an "acceptable medical source" and/or a "treating

source" under the regulations, Social Security Ruling 06-03p discusses how evidence from other

sources should be reviewed. <u>Crawford v. Commissioner of Social Security</u>, 363 F. 3d 1155, 1160

(11th Cir. 2004). With regard to "other sources" the regulations state as follows:

> In addition to evidence from "acceptable medical sources," we may
> use evidence from "other sources," as defined in 20 CFR 404.1513(d)
> and 416.913(d), to show the severity of the individual's impairment(s)
> and how it affects the individual's ability to function. These sources
> include, but are not limited to:
>
> Medical sources who are not "acceptable medical sources," such as
> nurse practitioners, physician assistants, licensed clinical social
> workers, naturopaths, **chiropractors**, audiologists, and therapists; and
>
> "Non-medical Sources" including, but not limited to:
>
> Educational personnel, such as school teachers, counselors, early
> intervention team members, developmental center workers, and
> daycare center workers;
> Public and private social welfare agency personnel, rehabilitation
> counselors; and

> Spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, clergy, and employers.
>
> Information from these "other sources" cannot establish the existence of a medically determinable impairment. Instead, there must be evidence from an "acceptable medical source" for this purpose. However, information from such "other sources" may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function.

SSR 06-03p (emphasis added).

Additionally, an ALJ is required to state with particularity the weight given to different medical opinions and the reasons therefor. Sharfaz v. Bowen, 825. F. 2d 278, 279 (11th Cir. 1987). In the instant matter, Dr. Strauss is not considered an "acceptable medical source" under SSR 06-03p, however, he would be considered an "other source." While an "other source" cannot establish the existence of a medically determinable impairment, he can be used to provide insight into the severity of the impairment and how it impacts the individual's ability to function.

In the instant matter, the Plaintiff testified she was being treated by Dr. Strauss on a monthly basis, which was more often than what she saw any of her other doctors. (R. 669). Medical records reveal that Dr. Strauss treated Nadal from January through December 2006, on an almost bi-weekly basis. (R. 581-606). Additionally, similar to Dr. Strauss' opinion (R. 587), Drs. Ahmed, Magcalas and Logrono opined that the Plaintiff would be unable to perform sedentary work. (R. 547, 610, 667-668).[7] Thus, it cannot be said that the limitations found by Dr. Strauss were so contrary to the evidence as to reject his assessment. Furthermore, in rejecting Dr. Strauss' assessment, this Court

---

7. This Court notes that Drs. Ahmed, Magcalas and Logrono stated in part of their assessments that the Plaintiff was capable of lifting/carrying no more than 10 pounds and standing/walking for approximately 2 hours. (R. 395, 544, 607). These assessments would mean that Nadal is capable of sedentary work as defined by the regulations. 20 C.F.R. § 404.1567(a). However, the ALJ never clarified this apparent discrepancy in the record.

22

agrees with the Plaintiff that the ALJ failed to explain how Dr. Strauss's opinion is inconsistent with the medical record. Accordingly, the Court finds that remand is required so the opinion of Dr. Strauss can be properly evaluated.

The Plaintiff also contends that the ALJ improperly rejected the Plaintiff's testimony based on rejecting Dr. Strauss's opinion and Dr. Magcalas's statement that the Plaintiff's lung cancer had not recurred and that her COPD was stable. It is well established that pain alone can be disabling. Walker v. Bowen, 826 F. 2d 996, 1003 (11th Cir. 1987). In determining whether the Plaintiff suffers from disabling pain; the following test must be satisfied:

> [T]o establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.

Lamb v. Bowen, 847 F. 2d 698, 702 (11th Cir. 1988).

In the instant case, the first prong of the Lamb test was satisfied as the ALJ found the existence of an underlying medical condition. The ALJ found that the Plaintiff suffered from  a history of lung cancer, status post lobectomies (x2), and chronic obstructive pulmonary disease, all severe impairments but not severe enough to meet or medically equal, either singly or in combination to one of the listed impairments listed in Appendix 1, Subpart P, Regulation No. 4 as of July 1, 2005. (R. 24, 28).

The analysis then shifts to the second prong of the test. Disabling pain could be shown in one of two methods. One, by objective medical evidence confirming the severity of the alleged pain or by showing that the underlying objectively determined medical condition is of a severity which can

reasonably be expected to give rise to the alleged pain. Lamb, at 702.

Once the ALJ determined that the objective medical evidence did not confirm the severity of the Plaintiff's alleged pain he must then look towards the Plaintiff's subjective complaints and determine whether they can reasonable be expected to produce the alleged pain. "Whether or not the condition could be expected to give rise to the complained of pain is a question of fact subject to the substantial evidence standard of review." Lamb, at 702, citing to, Hand v. Heckler, 761 F. 2d 1545, 1549 (11th Cir. 1985); Boyd v. Heckler, 704 F. 2d 1207, 1209 (11th Cir. 1983).

The credibility of the Plaintiff's testimony must also be considered in determining if the underlying medical condition is of a severity which can reasonably be expected to produce the alleged pain. Lamb, at 702. If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so. Wilson v. Barnhart, 284 F. 3d 1219, 1225 (11th Cir. 2002). Failure to articulate the reasons for discrediting subjective testimony requires as a matter of law, that the testimony be accepted as true. Id.

With regard to the Plaintiff's credibility, the ALJ noted as follows:

> After considering the evidence of record, I find that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible beginning on July 1, 2005.

(R. 30).

While, an ALJ may not reject a plaintiff's subjective complaints of pain simply by the lack of objective evidence, the allegations of a severe impairment should be supported by medically acceptable clinical and laboratory diagnostic techniques; and allegations of pain should be weighed with the overall record which includes clinical data, testimony, demeanor at the hearing, frequency

24

of treatment, response to treatment, use of medications, daily activities, motivations, credibility and residual functional capacity. Watson v. Heckler, 738 F. 2d 1169, 1172-1173 (11th Cir. 1984).

Further, the claimant's testimony of pain or other subjective symptoms standing alone, are not conclusive evidence of disability. See, Macia v. Bowen, 829 F. 2d 1009, 1011 (11th Cir. 1987). If an ALJ rejects a claimant's testimony on credibility grounds, the ALJ must explicitly state as much and give adequate reasons for that determination. Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995). There is no requirement that the ALJ refer to every piece of evidence, but the credibility determination must not be "a broad rejection." Dyer, 395 F.3d at 1211. Failure to set out the reasons for the discrediting of subjective pain testimony mandates, as a matter of law, that the testimony be accepted as true. Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002).

In the instant matter, the ALJ reviewed the Plaintiff's testimony and then stated as follows:

> The medical evidence as if July 1, 2005 is somewhat conflicting; but, on balance, supports a finding that the claimant could perform at the sedentary exertional level with some limitations. These non-exertional limitations do not significantly erode the claimant's sedentary occupational base. Social Security Rulings SSRs 96-9p, 83-14, and 85-15. There has been no recurrence of the claimant's lung cancer, and her chronic obstructive pulmonary disease was deemed to be clinically stable by Dr. [Magcalas] (Exhibit 30F/12). CT scans of her chest, beginning in December 2004, were essentially normal as well.

(R. 30).

This Court notes that it is unclear what the ALJ's reasoning for rejecting the Plaintiff's testimony is based on. Accordingly, it is the opinion of this Court, that the case should be remanded so that the Plaintiff's credibility can be reexamined.

The Plaintiff's final points of contention are that the ALJ's determination that the Plaintiff's medical improvement was related to her ability to work was not supported by substantial evidence

and that the ALJ committed reversible error by not documenting how he applied the 8-step medical improvement sequential evaluation process to the Plaintiff's case.  Specifically, the Plaintiff contends that the ALJ determined due to Nadal's lung cancer not recurring and her COPD being stable as of May 2005 that her RFC improved from less than sedentary to sedentary.  The Defendant argues that the Plaintiff points to no evidence after July 1, 2005, which indicates that symptoms relating to her COPD are disabling.

The Court finds that the remaining arguments raised by the Plaintiff have merit.  The Court notes that the decision by the ALJ effectively discounted the opinion of Dr. Strauss and other treating physicians and essentially determined the residual functional capacity by making his own assessment that the Plaintiff was capable of sedentary work.  This determination also effected the finding of ability to do past work.  On remand, the ALJ should obtain clarification from Dr. Magcalas as to what he meant by "stable."  As this Court agrees with the Plaintiff that "stable" does not necessarily mean "improved."  Additionally, the ALJ should articulate how he applied the 8-step medical improvement sequential evaluation process to the Plaintiff's case.  It is the opinion of this Court that remand is required for the reasons set forth above.

### III.  CONCLUSION AND RECOMMENDATION

Based on the foregoing, this Court finds that the decision of the ALJ was not supported by substantial evidence and that the correct legal standards were not applied.  Therefore, it is the recommendation of this Court that the decision of the Commissioner be **REVERSED and REMANDED** for further evaluation.  Accordingly, the Motion for Summary Judgment filed by the Plaintiff (D.E. #14) should be **GRANTED in part** and the Motion for Summary Judgment  filed by the Defendant (D.E. #20) should be **DENIED**.

26

Pursuant to Local Magistrate Rule 4(b), the parties have fourteen (14) days from service of this Report and Recommendation within which to serve and file written objections, if any, with the Honorable Cecilia M. Altonaga, United States District Judge.  Failure to file objections timely shall bar the parties from attacking on appeal the factual findings contained herein. Loconte v. Dugger, 847 F.2d 745 (11th Cir. 1988), cert. denied, 488 U.S. 958 (1988); R.T.C. v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).

**DONE AND ORDERED** this ___26___ day of May, 2010.

ROBERT L. DUBÉ
UNITED STATES MAGISTRATE JUDGE